# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

## LAFAYETTE DIVISION

| | |
|---|---|
| **RICKY LEE CARLIN** | **CIVIL ACTION NO. 6:12-cv-2200** |
| **VERSUS** | **JUDGE HAIK** |
| **COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION** | **MAGISTRATE JUDGE HILL** |

## REPORT AND RECOMMENDATION

This social security appeal was referred to me for review, Report and Recommendation pursuant to this Court's Standing Order of July 8, 1993. Claimant, Ricky Lee Carlin, born October 5, 1976, filed applications for a period of disability, disability insurance benefits, and supplemental security income on June 9, 2010, alleging disability as of February 7, 2010, due to diabetes mellitus Type II, high blood pressure, depression, back pain, knee pain, sleep apnea, arthritis, and high cholesterol.

After his applications were denied, claimant requested a hearing, which was held on February 10, 2011. The Administrative Law Judge ("ALJ") issued an unfavorable ruling on June 1, 2011. Claimant requested review by the Appeals Council, which denied review on June 19, 2012. On August 17, 2012, claimant filed a Complaint in this Court.

<u>FINDINGS AND CONCLUSIONS</u>

After a review of the entire administrative record and the briefs filed by the parties, and pursuant to 42 U.S.C. § 405(g), I find that there is substantial evidence in the record to support the Commissioner's decision of non-disability and that the Commissioner's decision comports with all relevant legal standards. *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

In fulfillment of F.R.Civ.P. 52, I find that the Commissioner's findings and conclusions are supported by substantial evidence, which can be outlined as follows:

**(1) Records from Acadian Medical Center dated February 6-13, 2010**. Claimant was admitted for a scrotal abcess and cellulitis.  (Tr. 165-177).  The abcess was drained, and claimant was placed on antibiotics.  (Tr. 199).  He was diagnosed with new onset of Type 2 diabetes and hypertension.  (Tr. 177).

An abdominal ultrasound dated February 9, 2010, showed mild splenomegaly.  (Tr. 198).  After his discharge on February 13, claimant was treated by Evangeline Home Health Agency from February 14, 2010 to March 31, 2010.  (Tr. 242-96).

**(2) Records from Mamou Health Resources dated March 10, 2010 to December 14, 2010**.  On his patient medical history, claimant wrote that he had

depression, smoked a pack of cigarettes per day, and consumed alcohol occasionally.  (Tr. 299).

On March 30, 2010, claimant was seen for follow-up for diabetes mellitus, hypertension, hyperlipidemia, and scrotal abscess.  (Tr. 304).  His blood pressure was 141/96, and weight was 355 pounds at 6 feet 1 inch tall.  His medications were continued.

On April 13, 2010, claimant was feeling better, and had no complaints.  (Tr. 303).  His blood pressure was 140/88.  He was instructed to lose weight through diet and exercise.

On May 19, 2010, claimant was feeling better, but not exercising.  (Tr. 302). His blood pressure was 159/108, and weight was 362 pounds.  He was encouraged again to exercise and diet.  His medications included Lantus vial, Zestril, Metformin, Metoprolol, Crestor, and HCTZ.  (Tr. 300).

On August 24, 2010, claimant complained of getting dizzy and passing out. (Tr. 323).  His blood sugar was approximately 110 most of the time.  He said that he was going to bed at 4:00 p.m.  He had no complaints at that time.

On examination, his blood pressure was 150/98, and weight was 367 pounds.  The impression was morbid obesity and diabetes mellitus.  The plan was a weight reduction plan, better sleep hygiene, and a sleep study.

On September 28, 2010, claimant complained of passing out, low back pain, diminished breath sounds, depression and anxiety.  (Tr. 320).  He stated that he often skipped meals, did not sleep well, and smoked a pack of cigarettes per day. His blood pressure was 130/80, and his weight was 360 pounds.

X-rays of the lumbar spine dated September 30, 2010, showed no compression deformity or malalignment, mild lumbar spondylosis, and minimal levoscoliosis.  (Tr. 330).  Chest x-rays were normal.  (Tr. 331).

On October 5, 2010, claimant reported that he still had back pain, but was no longer passing out.  (Tr. 319).  His blood pressure was 120/80, and his weight was 362 pounds.

At a follow-up appointment for weakness on November 2, 2010, claimant's blood pressure was 140/98, and his weight was 367 pounds.  (Tr. 318).  The impression was hypertension, diabetes, depression, sinusitis and chest congestion. His vertigo had improved, and Lexapro was helping some.

On November 16, 2010, claimant reported that his blood sugar at home was 115.  (Tr. 317).  His blood pressure was 140/80, and his weight was 355 pounds. The impression was diabetes, hypertension, and depression.  He was prescribed Chantix and diabetic shoes.

On December 14, 2010, claimant complained of another boil.  (Tr. 316).
His blood pressure was 140/80, and weight was 360 pounds.  The impression was
cellulitis of the right groin, diabetes Type 2, hypertension, and depression.  He was
prescribed Bactrim.  Other medications included Lantus, Crestor, Aspirin,
Lisinopril, Janumet, Metoprolol, Lexapro, and Chantix.  (Tr. 315).

### (3) Consultative Examination by Dr. Louis Nix dated March 3-24, 2011.

Claimant complained of passing out, back pain, and numbness in his legs.  (Tr.
346).  He also reported depression, high blood pressure, right knee pain, sleep
apnea, arthritis, and cholesterol problems.  (Tr. 346).  Additionally, he complained
of chest pain twice a week associated with shortness of breath, diaphoresis, and
dizziness.

Claimant's medications included Crestor, Toprol, Lantus Solostar, Lexapro,
Janumet, Aspirin, and Lisinopril-Hydrochlorothiazide.  He smoked a pack of
cigarettes per day.  (Tr. 347).  He walked twice a week.

On examination, claimant was 71 inches tall and weighed 362 pounds.  (Tr.
348).  His blood pressure was 130/88.  He had non-pitting bilateral lower
extremity edema.

On musculoskeletal examination, claimant had a limping gait.  (Tr. 349).
His Romberg was negative.  He had decreased flexion at 30 degrees.  Range of

motion and strength were normal in the upper extremities.  Claimant had distal weakness in the lower extremities.

Skin had no rashes, lesions, or ulcerations.  Sensation was intact.  Mental status exam was intact, except that claimant had depressed mood and affect.

Dr. Nix noted claimant's main complaint was lower back pain with varied daily intensity.  Claimant also admitted left leg numbness, and limitation in activities of daily living due to his back discomfort.  Additionally, claimant reported a problem with passing out without warning after his diabetes diagnosis.

Claimant's depression was evident over chronic pain.  He had full range of motion to the cervical spine, with pulling discomfort on the lower back.  He also had full range of motion to the shoulders, with pulling discomfort on the lower back.  (Tr. 350).

Claimant had decreased spine flexion at 30 degrees.  He was able to walk on his heels, unable to walk on his toes due to an increase in lower back pain, had a limping gait, had to alternate from sitting to standing due to back pain, had non-pitting lower extremity edema bilaterally, and diminished pedal pulses.  Dr. Nix saw no evidence of malingering.

In the Medical Source Statement of Ability to do Work-Related Activities (Physical), Dr. Nix found that claimant could lift/carry up to 10 pounds

occasionally because of daily lower back pain with limping gait, decreased spine flexion, inability to walk on his toes, and alternating positions during examination. (Tr. 340).  He also found that claimant could sit, stand, and walk for 15 minutes at a time, and approximately 60 to 100 minutes total out of an eight-hour work day. (Tr. 341).  He stated that claimant would have to alternate positions or lie down during the remaining time.  He checked that claimant did not require the use of a cane to ambulate.

Additionally, Dr. Nix checked that claimant could reach and push/pull occasionally, and handle, finger, and feel frequently.  (Tr. 342).  He checked that claimant could use his feet occasionally.  He checked that claimant could occasionally climb stairs and ramps, and never climb ladders or scaffolds, balance, stoop, kneel, crouch, or crawl because of low back pain, limping gait, inability to walk on his toes due to increased back pain, and syncope.  (Tr. 343).  He also checked that claimant could never tolerate exposure to unprotected heights or moving mechanical parts; could occasionally operate a motor vehicle and tolerate vibrations; could frequently tolerate humidity and wetness and extreme heat and cold, and continuously tolerate dust, odors, fumes and pulmonary irritants, and very loud noise.  (Tr. 344).

Dr. Nix also checked that claimant could not perform activities like shopping or walking a block at a reasonable pace on rough or uneven surfaces. (Tr. 345).  However, he could travel without a companion for assistance, ambulate without an assistive device, use standard public transportation, climb a few steps at a reasonable pace using a single hand rail, prepare a simple meal and feed himself, care for personal hygiene, and sort, handle, and use paper/files.  He checked that these limitations had lasted our would last for 12 consecutive months.

**(4) Claimant's Administrative Hearing Testimony**.  At the hearing on February 10, 2011, claimant testified that he had stopped working on February 7, 2010, after he was diagnosed with diabetes.[1]  (Tr. 28).  He said that he weighed about 362 pounds.  (Tr. 42).

Claimant stated that he had originally stopped working in 2009 because he was laid off.  (Tr. 29).  He confirmed that he had applied for unemployment and was continuing to receive benefits.  (Tr. 29-30).

When the ALJ asked whether claimant realized that when he applied for unemployment he was indicating that he could work, he replied "Yes, ma'am." (Tr. 30).  He testified that he had applied for it as a "way to survive," and later

_____

[1]Claimant's Disability Report – Adult indicates that claimant had a tenth-grade education and work experience as a janitor helper and an oiler.  (Tr. 130)

-8-

said that he physically could not work.  He stated that he could not work because he had passed out 11 times since February.  (Tr. 31).

Additionally, claimant complained of lower back and right knee pain, left leg numbness, and cold feet.  (Tr. 36).  He also stated that he had sleep apnea, but had not been treated for it.  For treatment, claimant testified that he took medication for hypertension, cholesterol, depression, and diabetes.  (Tr. 33, 44-45).

Regarding his daily routine, claimant testified that he slept a lot during the day.  (Tr. 37).  He said that he could not watch television for long because he was uncomfortable sitting down.  (Tr. 37-38).

As to restrictions, claimant testified that he could stand for 15 minutes and sit for 10 minutes without having to change positions.  (Tr. 38).  He said that he had to lie down during the day.  He reported that he could walk about a block and lift a gallon of milk.  (Tr. 41).

Additionally, claimant testified that he could not concentrate for very long. (Tr. 43-44).  He said that his memory had never been good.  (Tr. 44).  He also complained of fatigue.

**(5) Administrative Hearing Testimony of Lionel J. Bordelon, Vocational Expert ("VE")**.  Mr. Bordelon classified claimant's past work as an

-9-

oiler as light to medium with a specific vocational preparation ("SVP") of four, and a janitor helper as medium with an SVP of three.  (Tr. 49).  The ALJ posed a hypothetical in which he asked the VE to assume a claimant of the same age, education, and past work experience; with the residual functional capacity for light work; with the need for only occasional postural limitations including climbing, balancing, stooping, kneeling, crouching, and crawling, and with the need to avoid exposures to extremes, such as cold, heat, humidity, poorly ventilated areas, chemicals, and unprotected heights.  (Tr. 50).  In response, Mr. Bordelon opined that he could not do his past work, but could work as a production weigher, of which there were 72,321 positions nationally and 997 statewide, and construction and motor transportation dispatcher, of which there were 112,099 jobs nationally and 2,262 statewide, 25 percent of which would fit within the hypothetical.  (Tr. 50-51).

When the ALJ added a limitation of the need for a work environment to be free of fast-paced production requirements, the VE diminished the identified jobs to 15 percent.  (Tr. 52).  After the ALJ added another limitation to a person who have to be absent from work one time per week, or up to four times per month, the VE responded that no jobs would be available.

ASSIGNMENT OF ERRORS

Claimant argues that the ALJ erred: (1) in failing to find that he was disabled and entitled to benefits; (2) in failing to find that he was at least disabled for a time and entitled to a closed period of disability benefits; (3) in failing to find that his testimony and complaints of pain were credible, and (4) in failing to give proper weight to the opinion of the ALJ's own expert, Dr. Nix.

Claimant argues that the ALJ erred in failing to give proper weight to the opinion of the ALJ's own expert, Dr. Nix.  The ALJ gave no weight to Dr. Nix's opinion, finding that the reported limitations were inconsistent with the record as a whole.  (Tr. 16).  She noted that the "extreme limitations" reported by Dr. Nix were also inconsistent with his examination findings, as he failed to reveal any significant clinical abnormalities.  Furthermore, she found that Dr. Nix's medical source statement suggested that he relied quite heavily on the subjective symptoms and limitations reported by claimant.

It is well established that "the ALJ has *sole* responsibility for determining a claimant's disability status."  (emphasis added).  *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000) (*citing Paul v. Shalala*, 29 F.3d 208, 211 (5th Cir. 1994)).  Further, the ALJ is free to reject the opinion of any expert when the evidence

-11-

supports a contrary conclusion.  *Id.*  Thus, it was within the province of the ALJ to reject Dr. Nix's opinion.

Furthermore, a careful review of the record reveals no physician-imposed restrictions on claimant's activities other than those of Dr. Nix, which as explained above, were properly discounted by the ALJ.  The lack of physician-imposed restrictions inconsistent with light and sedentary work rebuts his alleged inability to work.  *Hollis v. Bowen*, 837 F.2d 1378, 1387 (5th Cir. 1988). An ALJ may discount a claimant's subjective complaints when the alleged impairments contradict the medical evidence.  *Hernandez v. Astrue*, 278 Fed. App'x 333, 340 (5th Cir. 2008) (*citing Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992)). Here, Dr. Nix's findings are contradicted by the objective medical tests, including x-rays of the lumbar spine dated September 30, 2010, showing no compression deformity or malalignment, mild lumbar spondylosis, and minimal levoscoliosis of the lower back.  (Tr. 330).

Additionally, an ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion.  *Qualls v. Astrue*, 339 Fed. App'x 461, 466 (5th Cir. 2009) (*citing Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1987)). When a treating or examining physician's opinions are inconsistent with other substantial evidence in the record, the opinions are not entitled to any specific

-12-

weight in the ALJ's decision.  *DeLeon v. Barnhart*, 174 Fed. App'x 201, 202 (5th

Cir. 2006) (*citing Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994)).

Here, the ALJ discounted Dr. Nix's opinion because it was inconsistent with

his objective examination findings.  (Tr. 16).  She gave limited weight to the

findings of the single decision maker ("SDM"), noting that while the SDM was

not an acceptable medical source, the ALJ concurred with her conclusion that

although claimant's condition resulted in some limitation in his ability to perform

work-related activities, it was not severe enough to keep him from working.

Additionally, none of claimant's treating physicians have pronounced him

disabled.  *Harper v. Sullivan*, 887 F.2d 92, 97 (5th Cir.1989).

Clearly, the ALJ considered Dr. Nix's opinion as well as all of the medical

evidence in the record at the time of the hearing when reaching her conclusion that

claimant retained the residual functional capacity to perform light and sedentary

work.  Thus, the undersigned finds that the ALJ did not err in failing to give

weight to the one-time consultative examiner's opinion.

Next, claimant argues that the Commissioner failed to properly evaluate his

credibility.  "Once a medical impairment is established, the subjective complaints

of pain must be considered along with the medical evidence in determining the

individual's work capacity."  *Ripley v. Chater*, 67 F.3d 552, 556 (5th Cir. 1995).

-13-

In this case, the ALJ observed that claimant indicated in his Adult Function Report that he had no difficulty with personal care needs, performing household tasks, or grocery shopping.  (Tr. 11-12, 141-43).  The report also indicates that claimant prepared sandwiches and frozen dinners daily, talked with others weekly, and attended church regularly.  (Tr. 144).  It is appropriate to consider the claimant's daily activities when deciding the claimant's disability status.  *Leggett v. Chater*, 67 F.3d 558, 565 (5th Cir. 1995).

Additionally, the ALJ noted that claimant had not generally received the type of treatment expected for a totally disabled individual, in that he had "relatively infrequent" trips to the doctor for her allegedly disabling symptoms. (Tr. 14).  It is well established that the ALJ is not precluded from relying upon the lack of treatment as an indication of nondisability.  *Villa v. Sullivan*, 895 F.2d 1019, 1024 (5th Cir. 1990); C*hester v. Callahan*, 193 F.3d 10, 12 (1st Cir. 1999) (gaps in the medical record regarding treatment can constitute "evidence" for purposes of the disability determination); *McGuire v. Commissioner of Social Security*, 178 F.3d 1295, *7 (6th Cir.1999) (gaps in treatment may reasonably be viewed as inconsistent with a claim of debilitating symptoms); *Rautio v. Bowen*, 862 F.2d 176, 179 (8th Cir. 1988) (failure to seek aggressive treatment and limited

-14-

use of prescription medications is not suggestive of disabling condition); *Jules v.*

*Commissioner of Social Security*, 2013 WL 5935558, *4 (W.D. La. Nov. 1, 2013).

Further, the record reflects that claimant failed to comply with his doctors'

instructions.   Claimant reported to his physicians that he often skipped meals, did

not sleep well, failed to diet and exercise, and smoked a pack of cigarettes per day.

(Tr. 299, 302, 303, 320, 347).   It is well established that failure to follow

prescribed medical treatment precludes an award of benefits.  20 C.F.R. §

416.930(a), (b);  *Johnson v. Sullivan*, 894 F.2d 683, 685, n. 4 (5th Cir. 1990).

Significantly, the ALJ noted that claimant's subjective limitations appeared

to be overstated.  (Tr. 15).  Specifically, she referred to claimant's admission

during the hearing that he had been receiving unemployment compensation

benefits.  (Tr. 29-30).  When the ALJ asked claimant whether he realized that in

applying for unemployment he was indicating that he could work, he replied,

"Yes, ma'am."  (Tr. 30).  He testified that he had applied for it as a "way to

survive," and later said that he physically could not work.

As the ALJ observed, in order to receive unemployment benefits, the

applicant must assert that he is ready, willing, and able to go to work.

"Applications for unemployment and disability benefits are inherently

inconsistent.  There is 'no reasonable explanation for how a person can claim

-15-

disability benefits under the guise of being unable to work, and yet file an application for unemployment benefits claiming that [he] is ready and willing to work.' " *Redwine v. Astrue*, 2013 WL 3070850, *13 (E.D. La. June 17, 2013) (*quoting Workman v. Commissioner of Social Sec*., 105 F. App'x 794, 801-02 (6th Cir. 2004)).  The ALJ has the primary responsibility for resolving conflicts in the evidence.  *Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001); *Carrier v. Sullivan,* 944 F.2d 243, 247 (5th Cir.1991).  Thus, the ALJ's finding as to claimant's credibility is entitled to great deference.  *Newton v. Apfel*, 209 F.3d 448, 459 (5th Cir. 2000).

Next, claimant asserts that there has been no determination that he could hold whatever job he finds for a significant period of time, citing *Singletary v. Bowen*, 798 F.2d 818 (5th Cir. 1986).  However, since the issuance of its decision in *Watson v. Barnhart*, 288 F.3d 212 (5th Cir. 2002), the Fifth Circuit has determined that the Commissioner is not required to make a specific finding regarding the claimant's ability to maintain employment in every case.  *Dunbar v. Barnhart*, 330 F.3d 670, 672 (5th Cir. 2003); *Frank v. Barnhart*, 326 F.3d 618, 619 (5th Cir. 2003).  As stated in *Frank*:

> *Watson* requires a situation in which, by its nature, the claimant's physical ailment waxes and wanes in its manifestation of disabling symptoms.  For example, if [plaintiff] had alleged that her

degenerative disc disease prevented her from maintaining employment because every number of weeks she lost movement in her legs, this would be relevant to the disability determination. **At bottom, *Watson* holds that in order to support a finding of disability, the claimant's intermittently recurring symptoms must be of sufficient frequency or severity to prevent the claimant from holding a job for a significant period of time**. An ALJ may explore this factual predicate in connection with the claimant's physical diagnosis as well as in the ability-to-work determination. Usually, the issue of whether the claimant can maintain employment for a significant period of time will be subsumed in the analysis regarding the claimant's ability to obtain employment. Nevertheless, an occasion may arise, as in *Watson*, where the medical impairment, and the symptoms thereof, is of such a nature that separate consideration of whether the claimant is capable of maintaining employment is required.

(emphasis added). *Id*. at 619.

Here, claimant has not demonstrated that his symptoms were of sufficient frequency or severity to prevent him from holding a job for a significant period of time as required by *Watson*. As the ALJ found, while claimant's condition resulted in some limitation in his ability to perform work-related activities, it was not severe enough to keep him from working. (Tr. 16). This is supported by the medical evidence, as well as claimant's daily activities. Accordingly, claimant's argument lacks merit.

-17-

CONCLUSION

Based on the foregoing, it is my recommendation that the Commissioner's decision be **AFFIRMED** and that this action be **DISMISSED** with prejudice.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and F.R.Civ.Proc. 72(b), parties aggrieved by this recommendation have fourteen (14) business days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.  Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

**FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FACTUAL FINDINGS AND/OR THE PROPOSED LEGAL CONCLUSIONS REFLECTED IN THIS REPORT AND RECOMMENDATION WITHIN FOURTEEN (14) DAYS FOLLOWING THE DATE OF ITS SERVICE, OR WITHIN THE TIME FRAME AUTHORIZED BY FED.R.CIV.P. 6(b), SHALL BAR AN AGGRIEVED PARTY FROM ATTACKING THE FACTUAL FINDINGS OR THE LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT COURT,**

EXCEPT UPON GROUNDS OF PLAIN ERROR. *DOUGLASS V. UNITED SERVICES AUTOMOBILE ASSOCIATION*, 79 F.3D 1415 (5TH CIR. 1996).

Signed November 19, 2013 at Lafayette, Louisiana.

C. Michael Hill
_____
C. MICHAEL HILL
UNITED STATES MAGISTRATE JUDGE

Copy sent: RTH
On: 11/20/2013
By: MBD